

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 15, 2019

<u>BY ECF</u>

The Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   ***United States v. Mircea Constantinescu***, 19 Cr. 651 (LTS)
> ***United States v. Nikolaos Limberatos***, 19 Cr. 651 (LTS)
> ***United States v. Alin Hanes Calugaru***, 19 Cr. 651 (LTS)

Dear Judge Swain:

The Government respectfully submits this letter appealing from bail orders issued with respect to defendants Mircea Constantinescu, Nikolaos Limberatos, and Alin Hanes Calugaru.

## I.      Overview

From at least in or about 2014 until at least in or about September 2019, Constantinescu, Limberatos, and Calugaru were important members of a transnational organization that engaged in what is colloquially referred to as "ATM skimming" and money laundering (the "Skimming Organization"). The Skimming Organization unlawfully obtained victim accountholders' debit card account information by using advanced technological devices to surreptitiously record the debit card numbers and personal identification numbers at automatic teller machines ("ATMs"), and then manufacturing counterfeit and fraudulent debit cards that bore the victim accountholders' account information. The Skimming Organization's members then used those cards to fraudulently withdraw cash from victims' bank accounts.

Certain members of the Skimming Organization, including Constantinescu, Limberatos, and Calugaru directed, or worked in, teams that the Skimming Organization deployed across the United States in order to carry out ATM skimming attacks, casing ideal locations for the attacks, installing skimming devices on ATMs, removing those devices, and cashing out large numbers of fraudulent debit cards manufactured as a result of the skimming operations. Other members of the Skimming Organization, including Constantinescu and Limberatos, assisted in receiving packages containing skimming devices or component parts that were shipped from other parts of the United States and from abroad. Other members of the Skimming Organization assisted in engineering the skimming devices that the Skimming Organization used. Still other members of the Skimming Organization, including Constantinescu, Limberatos, and Calugaru, laundered the proceeds of the

October 15, 2019
Page 2

skimming attacks through bank accounts, properties, businesses, and the transportation of bulk cash.

The members of the Skimming Organization carried out hundreds of ATM skimming operations across the United States, including in New York and at least 17 other states. The scheme defrauded financial institutions and individual victims of more than $20 million.

Based on this conduct, Constantinescu, Limberatos, and Calugaru are charged with (a) access device fraud conspiracy; (b) wire fraud and bank fraud conspiracy; (c) aggravated identity theft; and (d) money laundering conspiracy. The Government seeks detention for each of these three defendants on the ground that no set of conditions can reasonably assure their appearance in Court. *See* 18 U.S.C. § 3142(f)(2)(A).

## II.    Procedural History

On October 10, 2019, 17 members of the Skimming Organization were arrested in this case. Eight of those defendants were presented in this District before the Honorable Ona T. Wang, United States Magistrate Judge for the Southern District of New York. The Government sought detention for four of those defendants (including Limberatos), and agreed to conditions of release for the other four. One of the defendants consented to detention. Magistrate Judge Wang set conditions for the release of Limberatos and another defendant for whom the Government sought detention. At the time of that hearing, law enforcement agents had just begun conducting a search of Limberatos's residence pursuant to a search warrant issued by a Magistrate Judge in the Eastern District of New York that same afternoon.

Four of the 17 defendants were presented in the Southern District of Florida before the Honorable Lauren Fleischer Louis, United States Magistrate Judge for the Southern District of Florida. The Government sought detention for two of those defendants (Constantinescu and Calugaru), and agreed to conditions of release for the other two. Magistrate Judge Louis set conditions for the release of Constantinescu and Calugaru, but ordered that her bail decision be stayed until the close of business today, October 15, 2019, in order for the Government to file this appeal of her decision. Magistrate Judge Louis further ordered that the stay would continue until the appeal is resolved by this Court.[1]

The five remaining defendants are presently in state or Immigration and Customs Enforcement custody (four) or pending extradition in Italy (one).

## III.    Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. *See* 18 U.S.C. § 3142(e) ("no condition or combination

---

[1] Magistrate Judge Louis indicated that she may file a memorandum explaining her bail decisions with respect to Constantinescu and Calugaru. To date, no such memorandum has been filed. *See United States v. Mircea Constantinescu*, et al., No. 19 Mag. 3633 (LFL).

October 15, 2019
Page 3

of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. *See, e.g.*, *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character . . . [and] financial resources"; and (4) the seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g).  Evidentiary rules do not apply at detention hearings and the Government is entitled to present evidence by way of proffer, among other means.  *See* 18 U.S.C. § 3142(f)(2); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) (same); *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

This Court reviews a Magistrate Judge's decision on a bail application *de novo*.  *United States v. Kirkaldy*, No. 98-1680, 1999 WL 357847, at *1 (2d Cir. May 26, 1999); *United States v. Leon*, 766 F.3d 77, 80 (2d Cir. 1985); *United States v. Lewis*, No. 16 Cr. 786 (NSR), 2017 WL 6547742, at *1 (S.D.N.Y. Dec. 20, 2017).  Accordingly, this Court "must independently analyze the factors laid out in the Bail Reform Act to determine whether there is any 'condition or combination of conditions [that] will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community.'" *Lewis*, 2017 WL 6547742, at *1 (quoting 18 U.S.C. § 3142; citing *Kirkaldy*, 1999 WL 357847, at *1).

## IV.   Argument

Constantinescu, Limberatos, and Calugaru each present a serious risk of nonappearance in Court, and no condition or combination of conditions can reasonably assure their appearance. Accordingly, these three defendants should be detained pending trial.

### a.   Mircea Constantinescu

There is no condition or combination of conditions that can reasonably assure Constaninescu's appearance in Court throughout the course of this case.  The weight of the evidence against Constantinescu is overwhelming.  Moreover, Constantinescu possesses strong ties to Romania; has demonstrated a willingness to flee; has access to financial and other resources that would enable him to flee; and is facing a substantial sentence.

October 15, 2019
Page 4

### 1.   The weight of the evidence against Constantinsecu is overwhelming

Constantinescu was a key participant in the Skimming Organization – in particular, in shipping and receiving packages containing skimming devices and skimming-related equipment. The evidence of that participation is damning.   During the course of the investigation, Constantinescu's phone was intercepted for approximately two months.   Constantinescu was captured discussing his skimming and money laundering activities for the Organization, including the placement of skimming devices and the shipment of packages containing those devices.   Those communications demonstrate his extensive involvement in the Organization.

Indeed, the intercepted communications led law enforcement agents to packages containing skimming-related equipment that Constantinescu either sent or received, including to and from one of the leaders of the Organization based in Mexico.   For example, on or about June 26, 2018, Constantinescu shipped a credit card point-of-sale terminal that is used to fashion skimming devices from a shipping facility in Pennsylvania to that co-conspirator in Veracruz, Mexico.   That point-of-sale terminal is depicted below:



October 15, 2019
Page 5

As an additional example, on or about July 12, 2018, Constantinescu sent a package containing multiple Triton ATM card reader slot devices, at least one of which contained a small hole on the front left corner where a camera could be place to record users' personal identification numbers, to an address on West End Avenue in Manhattan:



October 15, 2019
Page 6

    And on or about July 31, 2018, Constantinescu received from a co-conspirator in Mexico a package containing a DVR unit that had, secreted inside it, two credit card point-of-sale terminal overlays, equipped with electronics and wires to connect them to a computer in order to download stolen card information, as depicted below:



    This evidence alone – Constantinescu's own incriminating words and the photographic evidence of his involvement in the conspiracy – provides substantial incentive for Constantinescu to flee.  And the Guidelines range Constantinescu faces if convicted after trial only increases that incentive.  A rough calculation of Constantinescu's Guidelines range yields an applicable range of approximately 108 to 135 months, with a mandatory two years' imprisonment consecutive to any other sentence imposed because of the aggravated identity theft offense with which Constantinescu is charged.  Facing those Guidelines, and in light of the Government's overwhelming evidence, Constantinescu has little incentive to remain in the United States to face the consequences of his actions.

### 2.  Constantinescu's history, characteristics, and financial resources pose a serious risk of flight

    Constantinescu's history, characteristics, and financial resources also weigh in favor of detention.  He has extensive ties to Romania, and apparent access to resources there that would

October 15, 2019
Page 7

enable him to flee to that country and live undetected there.  He is a dual citizen of the United States and Romania, and has family living in Romania, including his mother.  During an intercepted conversation, Constantinescu told another individual that he and his wife own three different homes in Romania.  Constantinescu traveled to Romania in 2018 and to Mexico in 2014, both countries in which multiple members of the Skimming Organization resided.  And Constantinescu's wife and children do not provide the incentive to stay in the United States that they otherwise might – his wife, too, is charged in this case, and also has a strong incentive to flee.

Constantinescu has, moreover, demonstrated an inclination to take steps to evade law enforcement detection, including by uprooting his life on short notice.  He has changed his residence and moved to different states multiple times during the course of the investigation.  He was captured on a wiretap telling someone that he was "considering not registering the kids for a year, to make it look like they left the country."  He was captured telling another individual that he wanted his wife to go to Romania until an apparent domestic case was closed, so that the case would have to be dropped.[2]  And he has demonstrated a willingness to flout judicial orders, as he and his wife appear, based on wiretap recordings, to have utterly ignored an order of protection separating them (including preventing them from communicating by telephone), entered on or about June 22, 2018, by continuing to discuss their criminal activity over the next couple of months by telephone.

Wiretap recordings further demonstrate that Constantinescu may have significant alcohol problems.  Constantinescu did not report those issues to Pretrial Services, but they are clear from the wiretap recordings.  For example, in the April 19, 2018 arrest report mentioned *supra*, Constantinescu was alleged to have been highly intoxicated.  In addition, Constantinescu described in wiretap recordings an incident in which he became, by his own admission, highly intoxicated at an airport and hit a clerk, for which he was "given a ticket."  Such tendencies make Constantinescu a further risk for nonappearance in Court.

Finally, Constantinescu appears to have access to significant financial resources.  He moved money for the Skimming Organization, and he was involved in procuring attorneys for individuals arrested during the Organization's operation.  On one recording, Constantinescu asked, "Why should I go to work for a thousand dollars a week when I can make a thousand dollars a day?"  On another, after telling a co-conspirator that he had "ordered the parts" and was "building" something, Constantinescu remarked, "Always money is coming."  The ability to secure a large amount of funds in a short time, combined with Constantinescu's history and characteristics, render him a serious risk of flight.

### b.  Nikolaos Limberatos

Permitting Limberatos to remain on bail is inappropriate in light of the serious risk of flight that he poses, the crushing weight of the evidence against him, the high penalties he faces, and his history, characteristics, and financial resources.  His incentive to flee is strong, he has the ability

---

[2] According to an arrest report, Constantinescu was arrested on or about April 19, 2018, based on an incident in which his victim alleged that he punched her with a closed fist in the left eye and subsequently threw a glass vase, while his minor children were at home and awake.

October 15, 2019
Page 8

to do so, and there is no condition or combination of conditions that can reasonably assure that he
will voluntarily participate in this process for the duration of the case.

### 1. The weight of the evidence against Limberatos is overwhelming

Limberatos was captured on wiretap recordings on two of his telephones over many weeks,
discussing with co-conspirators his involvement in the Skimming Organization on hundreds of
telephone calls. Not only do the wiretap recordings demonstrate that he was a member of the
conspiracy, but they also make plain that he was a leader of the Skimming Organization, and that
he was involved in nearly every aspect—importation of advanced skimming technology from
abroad, manufacturing and modification of those devices, placement of the skimming devices on
ATMs throughout the United States, coordination of crews of co-conspirators to "cash out"
fraudulent debit cards, and laundering the massive proceeds of the scheme.

In addition to the wiretap recordings, Limberatos was captured on ATM and bank
surveillance footage participating in ATM skimming incidents throughout the United States, such
as the following:



October 15, 2019
Page 9

On top of the essentially irrefutable evidence of wiretap recordings and surveillance footage, law enforcement agents executed a search warrant at Limberatos's residence on the same date he was arrested, yielded copious physical evidence of Limberatos's participation in ATM skimming, including, but not limited to, the following:

- A credit/debit card encoder, as depicted in the following photograph.  Members of the Skimming Organization often used credit/debit card encoders such as the one depicted in the photograph below to program counterfeit credit and/or debit cards with account information they fraudulently obtained through ATM skimming.



October 15, 2019
Page 10

- Small electronic components as depicted in the following photographs. Members of the Skimming Organization used the type of components contained in the photographs below to manufacture and/or modify small cameras that were placed on or near ATMs to record users' personal identification numbers as they were input.

 

- A highly advanced "deep insert" ATM skimming device, as depicted in the following photograph:



October 15, 2019
Page 11

- A false panel with a covertly installed camera system designed to surreptitiously record the personal identification numbers when victims use an ATM, as depicted in the following photograph:



- Dozens of fraudulently manufactured debit cards which appear to have the victims' personal identification numbers written on them, including those depicted in the following photograph:



October 15, 2019
Page 12

In light of the crushing weight of the evidence against Limberatos, he faces significant penalties, rendering him a serious risk of flight.  His rough Guidelines range is approximately 108 to 135 months' imprisonment, plus the mandatory minimum consecutive 2-year term of imprisonment for the aggravated identity theft count.[3]  Moreover, Limberatos, a Greek citizen, will face mandatory deportation upon conviction of the aggravated felonies with which he is charged.  In other words, Limberatos will either voluntarily participate in the judicial process and serve at least two years in prison (likely far more) before being deported to Greece, or short-circuit that process and self-deport to Greece in an attempt to avoid the prison time he is facing.  Limberatos's incentive to flee is substantial and cannot adequately be addressed by any conditions.[4]

> **2.  Limberatos's history, characteristics, and financial resources pose a serious risk of flight**

In light of the overwhelming and essentially indisputable evidence of Limberatos's guilt, the potential lengthy term of imprisonment that could be imposed in this case, and the mandatory deportation he faces upon conviction for the crimes with which he is charged, his incentive to flee is strong.  Just as troubling is that Limberatos also has the ability to do so.  Although the Government has strong suspicions that Limberatos has access to secreted funds, some of which may be held abroad, he readily admitted to Pretrial Services that he has $60,000 in his bank account—far more than would be needed to secure a new passport from the Greek embassy, purchase an airplane ticket, or even to obtain fraudulent identity documents or travel by land or sea.  Members of the Skimming Organization have been known to use false identity documents and/or aliases when traveling abroad, and Limberatos, a leader of the Skimming Organization, certainly has access to such resources and methods.

> **c.  Alin Hanes Calugaru**

Calugaru poses a serious risk of flight and there is no condition or combination of conditions that can reasonably assure his appearance.  Specifically, the weight of the evidence

---

[3] This approximate calculation does not take into account the evidence seized from Limberatos's residence, which may substantially increase his exposure at sentencing.

[4] Unlike Constantinescu and Calugaru, Limberatos presently is on pretrial release.  Even if Limberatos appears for any hearing the Court may set with respect to the Government's request for his detention, such appearance should accord him no benefit in the Court's weighing of the factors concerning the Government's request.  Defendants who choose to flee generally do not do so until shortly before a scheduled change of plea hearing or trial, or even later.  *E.g.*, *United States v. Jose Camarena-Familia*, 18 Cr. 649 (KPF) (defendant fled shortly before change of plea hearing); *United States v. Abraham Rodriguez*, 18 Cr. 149 (NRB) (defendant fled shortly before change of plea hearing); *United States v. Zhengquan Zhang*, 17 Cr. 560 (JMF) (defendant fled shortly before trial); *United States v. Sonyeris Calderon-Ceballos*, 17 Cr. 409 (KPF) (defendant fled after sentence was imposed); *United States v. Juan Serrano Liriano and Eric de los Santos Alduey*, 17 Cr. 388 (KMW) (one defendant fled shortly before trial; another defendant fled during trial).

October 15, 2019
Page 13

against Calugaru is overwhelming and his history, characteristics, and financial resources strongly suggest that he would flee rather than appear in Court voluntarily to face the charges against him.

**1.   The weight of the evidence against Calugaru is overwhelming**

Calugaru appears on ATM surveillance footage engaging in all manner of skimming activity for dozens of skimming operations around the United States.  As just a few examples, below are four photographs of Calugaru participating in known skimming operations:



Dime Savings  1/23/17
814 Manhattan  Ave NY
Saving Institute Bank Skim



TD Bank  4/15/17
8661 Colesville  RD Silver Springs
MD

October 15, 2019
Page 14



Santander Bank 6/11/17
45 East 53rd St NY NY
Pen Fed Skim (5/27 Skim)



TD Bank 7/1/17
185 Franklin St Boston MA
Citizens Skim

October 15, 2019
Page 15

In addition to the skimming operations in New York, Maryland, and Massachusetts reflected in the photographs above, Calugaru appears on ATM surveillance footage engaging in skimming activity as part of skimming operations in Connecticut and Pennsylvania as well. The sheer number of skimming operations around the United States in which Calugaru participated distinguishes his conduct from nearly every other defendant charged in this case.

Calugaru is distinguishable from other defendants in this case in another important respect. Many other defendants limited their conduct either to handling skimming devices or to cashing out fraudulent cards, thus avoiding being captured on ATM surveillance footage twice for the same skimming operation. Not Calugaru. Presumably to increase his share of the proceeds from the operations, Calugaru often participated in both the data capturing phase and the cashing out phase of a skimming operation: He appears on surveillance footage at times and locations where skimming equipment was installed, removed, or adjusted, and then he subsequently appears on surveillance footage from other ATMs cashing out fraudulent cards that were created as part of the same operation.

The evidence of Calugaru's money laundering is just as overwhelming as the evidence of his skimming. For example, one of Calugaru's co-conspirators was intercepted on a wiretap telling one of Calugaru's codefendants that a "guy" would be depositing thousands of dollars in cash into the codefendant's account. The co-conspirator then asked the codefendant to transfer that sum of money into the co-conspirator's own account. After that call, Calugaru was captured on bank surveillance footage depositing large stacks of cash into his codefendant's bank account, and bank records show that his codefendant dutifully transferred the funds to the co-conspirator.

In light of the overwhelming evidence against Calugaru, he faces significant penalties, rendering him a serious risk of flight. His rough Guidelines range is 108 to 135 months' imprisonment, plus the mandatory minimum consecutive 2-year term of imprisonment for the aggravated identity theft count. Moreover, Calugaru, a Romanian citizen, will face mandatory deportation upon conviction of the aggravated felonies with which he is charged. In other words, Calugaru will effectively confront the following choice if he is not detained: voluntarily participate in the judicial process, which will at the very least result in two years' imprisonment before deportation to Romania, or flee now. In the Government's view, that is no choice at all, and Calugaru should be detained to avoid his serious risk of flight.

### 2. Calugaru's history, characteristics, and financial resources pose a serious risk of flight

Multiple aspects of Calugaru's character make him a flight risk. For one thing, Calugaru is a citizen of Romania and has relatives who reside there. For another thing, Calugaru has demonstrated a willingness and ability to travel extensively in furtherance of the conspiracies with which he is charged. From November 2016 until only a few weeks ago, Calugaru made numerous trips to locations in the eastern United States, both by car and by plane, to participate in skimming operations.

Calugaru has also displayed characteristics of someone who has the ability and the means to avoid law-enforcement detection. During an October 2017 encounter with law enforcement, further discussed below, Calugaru was found in possession of three separate cellphones. Similarly,

October 15, 2019
Page 16

when Calugaru was arrested last week, he was found with three cellphones: two smartphones and one low-tech flip phone.  Calugaru stated to law enforcement that he used the flip phone to speak to only one person, whom he described as a "snitch."  In the Government's experience, criminals often use a low-tech "burner" phone so that they can discuss or perpetrate criminal activity on a device other than their day-to-day smartphone.  Calugaru's willingness and ability to use such means of law-enforcement evasion underscore his risk of flight.

Finally, Calugaru's financial resources and access to cash make him a serious flight risk. In fact, Calugaru's easy access to bulk amounts of cash meaningfully distinguishes him from many other defendants in this case.  As already discussed, there is overwhelming evidence that Calugaru has personally cashed out many thousands of dollars from fraudulent cards, and has deposited many thousands of dollars in cash at any one time into codefendants' bank accounts.  And Calugaru was arrested last week with nearly $8,000 in cash, which seriously undermines his statement to Pretrial Services that his assets amount to a bank account with less than $1,000.

Nor was last week's arrest the first time that law enforcement found Calugaru in possession of bulk amounts of U.S. currency.  In October 2017, while executing a traffic stop on a vehicle in which Calugaru was a passenger, law enforcement found approximately $4,000 in cash in the glove compartment and approximately $106,000 in cash secreted in a suitcase.  Calugaru admitted that the money was his and that he intended to use it to "buy a wife" for immigration purposes. Calugaru's ready access to bulk amounts of cash poses a serious risk of flight.

V.     **Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court order that Constantinescu, Limberatos, and Calugaru be detained pending trial.[5]

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By  *Robert B. Sobelman*

Elizabeth A. Hanft
Daniel M. Loss
Samuel P. Rothschild
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-2334/6527/2504/2616

---

[5] Government counsel is available at the Court's convenience for a hearing on the Government's appeal.  Counsel for Constantinescu and Calugaru, who were appointed in the Southern District of Florida to handle their clients' respective presentments in that district, indicated to the Government that they intend to make themselves available to participate by telephone.

October 15, 2019
Page 17

cc:    Bonnie Phillips-Williams, Esq. (by email to bonnie_phillips-williams@fd.org)
       Counsel for Mircea Constantinescu in the Southern District of Florida

       Karloff Commissiong, Esq. (by ECF and email to karloff@amcmlaw.com)
       Counsel for Nikolaos Limberatos in the Southern District of New York

       Arthur Wallace, Esq. (by email to wallacelawfirm@yahoo.com)
       Counsel for Alin Hanes Calugaru in the Southern District of Florida